All rise. The judges of the United States Court of Appeals. Hear ye, hear ye. The United States Court of Appeals for the Sixth Circuit is now in session. All persons in their business before this honorable court, draw near, give attention, and ye shall be heard. God save the United States and this honorable court. Please be seated. Good afternoon. The Sixth Circuit is pleased to be able to sit here in this historic courtroom to hear arguments in two cases this afternoon. As you know, our member states are Michigan, Ohio, Kentucky, and Tennessee. And the seat of the court is in Cincinnati. So that is traditionally where the court sits and hears argument. It is not unprecedented for the court to have heard arguments in other states and in other venues. But as a general rule, our court hears argument in Cincinnati. Judge Gil Merritt, Judge Eugene Seiler, and myself are very pleased this afternoon that so many students are able to be a part of the audience for arguments this afternoon. And we are thankful to Dean Lettsu and the staff of the University of Memphis School of Law for accommodating the court for purposes of these arguments. I know the parties who have not had to travel are appreciative of being able to have the arguments heard locally. We have two cases on the docket this afternoon. And before the clerk calls the first case, I would advise that if the appellant wishes to reserve time for rebuttal, please notify the clerk and announce it when you stand, even if you've previously advised the clerk. With that, are my colleagues, are there any other preliminaries before we announce the cases? The clerk may call the first case. Case number 15-5391, Andrew Lee Thomas, Jr. v. Bruce Wecker. Argument not to exceed 30 minutes per side. Mr. Hutton, you may proceed for the appellate. Good morning, Your Honor. I'd like to reserve five minutes for rebuttal. Robert Hutton for Mr. Andrew Thomas. May it please the Court. This case presents ten separate reasons that Andrew Thomas should get habeas corpus relief, all of which are meritorious. However, there are two arguments in this case, two claims that are truly exceptional. And it's those two exceptional claims that I'd like to focus my argument on this morning. That is the Brady claim and the false testimony claim. They're exceptional for several reasons. The first reason is neither of these claims are restricted by the deferential standards set forth in the Anti-Terrorism and Effective Death Penalty Act, because neither of these claims were discovered until, through no fault of Mr. Thomas, after the conclusion of his State Court appeals. Having said that, what standard of review should the Court apply in the case, since you say we're not bound by ECA? Your Honor, we have with the two claims, they have slightly different standards. The Brady claim, basically we just apply the substantive constitutional standard, which is with respect to Brady, that there is information that was exculpatory, that was withheld, that had it been disclosed was material, which under the Brady standard is whether there's a reasonable probability that it would have affected the verdict. And then with the false testimony claim, that there was testimony that was false, that was knowingly false, and that was material under the standard of is there any likelihood that it could have affected the verdict. Those words I was planning to talk about in the materiality of the argument, because we get these standards that we use, and to try to flesh out what the Court has said about that. But what's also extraordinary about these claims is how much is actually stipulated by the government in all these claims. If we look at, for example, the Brady claim, it has been stipulated by the warden, so it's conclusive before this Court, that the law enforcement made a $750 payment to Angela Jackson, that that payment was exculpatory in impeaching, that that knowledge of that payment was withheld from the defense, that Mr. Thomas and the counsel did not know about that. It's been stipulated that had they known about that, they would have used that in cross-examining and impeaching Angela Jackson. It's been stipulated that knowledge of that payment has been imputed to the prosecution for Brady purposes. What does it mean to say imputed? Imputed, meaning, Your Honor, in the Brady context, there's a lot of case law that says if law enforcement knows about something, that it's attributed to the prosecution because you don't want to have a situation where police are incentivized to hide evidence and not tell the prosecution about it. Well, didn't the prosecutor actually know about this? Was it in the record? Your Honor, here's what happened. We requested an evidentiary hearing, and one of the elements in the false testimony claim is different than the Brady claim, and we had a hearing requested, an evidentiary hearing on the false testimony claim, and what happened was the warden conceded in briefing knowledge for the false testimony claim. False testimony claims do require actual knowledge. They're a little bit different than Brady. So has that been conceded? Yes, Your Honor. That's been conceded, and that's what rendered moot our request for an evidentiary hearing. So, again, going back to how unique these claims are, the only issue remaining with the Brady claim, and they've conceded that, is materiality. That's the only thing this Court has to decide is whether or not had the jury known about this $750 payment, is there a reasonable probability it would have made a difference. With respect to the false testimony claim, in light of the concession and the briefing of knowledge of the payment by the Attorney General, the only then question is, given that the prosecution knew about the $750 payment, is Angela Jackson's testimony that she did not receive a reward and did not receive one red cent, is that material? Those are the – is it false, and then is that material? Do we have to look at whether just that point was material or whether Angela Jackson as a witness was so material that these actions would likely have caused the jury to come to a different result? Your Honor, in the context of materiality, this Court does look at the jury trial record to see what was the evidence that was presented at trial. And we get a lot of guidance from Sixth Circuit precedent about how do you determine that. The key cases from the Sixth Circuit are Robinson v. Mills, which is a 2010 case, and a procuring opinion that was published last year, Barton v. The Ohio Warden, which Your Honor was on the panel, both discuss materiality. Is that a question of law or fact? Materiality, Your Honor, is a question of law applying the facts of the record. There's a record that the Court is to look at the State court record and then determine from that record, with respect to the Brady claim, is there a reasonable probability that had this evidence been disclosed, it would have made a difference. Now, because – It's easy to see why she could see it wasn't a reward, because people think of rewards as something that's put out by authorities, whoever turns them in gets it. Well, Your Honor – Well, Your Honor, and I think that's a little bit of a red herring in this case, because with a prosecutorial misconduct case, it really doesn't matter what Angela Jackson thought. This is a due process type claim where there's an obligation on the government to correct false testimony. So the issue with the false testimony claim is here we have a prosecutor where it's been conceded in a briefing, knew about the $750 payment. But they're trying to present Angela Jackson as this witness who's a scared spouse who has no reason to come before the court to testify except for it's the right thing to do. And in the context of building that argument, the prosecutor, General Wyrick, when she's going through the examination, first is asking her about the FBI. Then she says, did you receive a reward? No. Did you get a reward? No. Did you receive a reward? No. On cross-examination, Michael Shull, who's the defense attorney, follows up with another broad question. Did you get any reward for this? To which she says no. And finally, General Wyrick on redirect says, you didn't get one red cent for this, did you? And she said, that's correct. I did not. So the concern with the claim is not what Angela Jackson knew. It's that the prosecution has an obligation to make sure that correct testimony is presented before the court. Okay, but at the time she made, the witness made that statement to Ms. Wyrick, had the payment already been made? Because in the record, it seems like there's a little bit of dissonance between when she got the money and the timing of the testimony and all of that. Am I making sense? This was a very unusual case because we had the robbery and shooting outside the Walgreens, but Mr. Day, the person that was shot, did not die. So there was a Federal prosecution for Federal charges, the robbery and the gun charge. Then after the Federal trial, Mr. Day, after the Federal trial, Angela Jackson was paid $750. Then Mr. Day died, and within a couple of years, he was retried then in the state court system for murder. Both of them, Mr. Bond and Wyrick. I do think with respect to materiality, though, there are things that this Court said we have to look at. We have to look at how important was the witness. First of all, we've got evidence that impeaches a particular witness. She probably didn't even remember getting it after she was in the post-conviction procedure, right? Well, Your Honor, She probably doesn't remember it to this day, although she signed that release. Well, here's when I took her, Judge McCalla let me take her deposition, and I got to take her deposition and ask her about that. And it's important to remember, $750, this was in 1998. That would be almost $1,200 by today's standards. This is a woman that testified that she made about $7 an hour. So that would have been like two weeks' payment for Angela Jackson. When I took her deposition, four times on the road she said, no, I didn't get a payment. No, I didn't get a payment. Then when I showed her the receipt where she signed for it, I don't remember the payment. That was testified to five times. Then on cross-examination, when the Attorney General started asking her a series of leading questions, to which she said, yes, yes, yes, she was asked, well, didn't you mean by reward, didn't you think you were being asked whether you got any money from the armored truck company, to which she said, yes. Then later when she was asked, well, what did you mean about one red cent, she said, well, I thought I was being asked whether I got anything. But the point is, Angela Jackson's testimony is all over the board. But I would submit to this Court, there's never been an explanation about why the government is paying $750 to this witness after she testified. And the federal witness fee is $40 that comes from the Marshal's office, not from the FBI. We know from the receipt that this is paid to her for her efforts with respect to Andrew Thomas and the prosecution of Andrew Thomas. Now, there's this affidavit in the record that the government says, oh, we did this. It was unanticipated. There was no reason for doing this. The jury was entitled to know about this because, frankly, they very well could have believed that there was something unusual about this. It's not every day that the government, that there was some kind of promise that was paid, that was promised to Angela Jackson. Okay. So, Mr. Hutton, let me ask you. Is there any case, any precedent for the proposition of finding falsity where a portion of the testimony, while technically true, is so misleading as to be effectively false? Is there some case for that? Because, you know, in going through her testimony, the questions she was asked about reward or payment and you're getting into now where she didn't remember. So my question is, while just looking at the statement on its face, some of the testimony might very well be technically true, but I'm asking, is there some case where you found in that situation where it could be considered effectively false? Because that's really what you're arguing, that it was false, that it was knowingly false. Well, Your Honor, we have two. Obviously, with respect to the false testimony claim, which is a separate basis for relief than the Brady claim, obviously, Your Honor, language is imprecise and the standard has to be unequivocally false. But what I would urge the Court to look at in this death penalty case is that this is a – you should focus on the prosecution. The prosecution stipulated is conceded new about the $750 payment. And General Weirich was orchestrating this testimony as if this is a disinterested witness. Did you ask about any reward? Did you receive any reward? And then on a redirect, come back, you didn't receive one red cent. Now, it is true she did not receive one red penny. There are no red pennies that were given. So literally, if you look at it that way, that is – that wasn't paid. But the fair import of the testimony that's being given to the jury is, oh, she had no reason. She's just up there because it's the right thing to do. And, Your Honor, when we know that that is not true, there is – You regard this as a perjured testimony case, right? That's what you're saying that when she took the stand and denied receiving anything, that she perjured herself. Yes, it is a – well, we're saying that the government has an obligation to put – for a jury in a criminal trial, particularly a death penalty trial. So when the government had knowledge of the $750 payment, which has been conceded, and they then allow the testimony to come forth asking questions about, did you get one red cent, and hearing, no, I didn't, they had an affirmative obligation as a matter of due process. That's what a – and a Pew claim is a due process claim to correct the record. Is it more egregious when the government is putting on something where they have imputed knowledge as compared to actual knowledge because the government, as you say, didn't even know about it except under this imputed knowledge? First of all – Judge Sala, first of all, I don't know what the government knew or didn't know because we didn't get to an evidentiary hearing. Because even though I asked for one, when the government conceded in their brief actual knowledge on the false testimony claim, that mooted the issue. So for purposes of this Court, that is conceded in briefing, which is a stipulation. This Court has to assume actual knowledge on the false testimony claim. Now, in any event, though, the Brady claim is a separate powerful claim for relief, and this Court has granted relief on $70 payments to witnesses in Robinson v. Mills. The United States Supreme Court has granted Brady relief on $200 payments in Banks v. Dredke. And what we know about the Brady claim is they've stipulated the payment, they've stipulated it was exculpatory, they've stipulated it should have been given to the defense and it wasn't, they've stipulated that the only thing left is materiality, which is whether there's a reasonable probability it would have made the difference. What do we know about this case? Angela Jackson was only one of two witnesses who testified at the State trial that directly implicated Thomas. The other one was Richard Fisher, but he's not credible because he identified  Did the jury know that? Yes, Your Honor, because what happened, well, the jury heard the testimony of Mr. Fisher because he first, in Mr. Thomas' trial, he first identified Anthony Bond as the person he saw. And that caused a big consternation. They have a sidebar. The trial judge says, well, I don't think Mr. Fisher really has any good recollection of what he said at all. Then, only on cross-examination, when Anthony Bond's counsel made Mr. Fisher get off the witness stand, come down to counsel table, look at him, take off his glasses, did he change his testimony to Andrew Thomas? So Mr. Fisher was not a credible witness, which leaves the only witness that was, the linchpin to their case was Angela Jackson. Okay, so what weight, if any, should we give to those statements in the record by a representative of the government about the importance or the primacy of Ms. Jackson as a witness? I mean, there were statements saying that we think she's really essential to the case or we doubt we could get a conviction without Ms. Jackson. Should we give any weight to that or should we let these other actors? Your Honor, here's what I do. Those statements are when the payment was presented where, after the federal trial, Agent Sanders says, I talked to U.S. Attorney Arvin and this is a critical witness and without her testimony we would not have been convicted. But I would submit that for looking at the state case, the state death case, everything's been stipulated except materiality. This Court should look at three things. How important, because the evidence goes to Angela Jackson. How important was Angela Jackson as a witness? She was the witness because Richard Fisher testified to two other people. So you had Angela Jackson. One way to see how material it is, if you look at the state court opinion, the state Supreme Court opinion describing the facts, there are seven references to Angela Jackson. There's only one to Richard Fisher. There is no forensic evidence linking Mr. Thomas to the scene. There was a fingerprint of Anthony Bond, but there wasn't to Mr. Thomas. He came across with a lot of money and bought him a fancy car, didn't he? Yes, Your Honor, but that all comes from Angela Jackson. The car was titled Angela Jackson. Didn't the salesman say he had seen this man, Thomas? There was a salesman with respect to the car that said that he saw there when Angela Jackson was buying the car. But it was Angela Jackson's testimony to the jury that said, A, the money came from a robbery, then that she got the money to buy the car from Mr. Thomas. So, again, we go to how important was Angela Jackson. Counsel, let me ask you. Yes, Your Honor. In the end, the question is what effect on the jury the false testimony, the failure to disclose, however you want to put it, call it, imputed, whatever. Yes, Your Honor. False testimony was what effect might it have had if she had said, Yes, I received a payment of $750 after the federal trial took place and had told the truth about that. What effect might that have had that would have been different from the outcome of the death penalty state case? Yes, Your Honor, that's correct. The cases talking about the standard of materiality like Cowles v. Whitley say it's less than a preponderance of the evidence. It's less than a civil standard. It's really more like are you confident in the absence of this evidence that the verdict is reliable, it's efficient, it's, you know, are we concerned about the case? It's something less than the civil standard. And what we have here when we have the key witness that we now know is a paid witness and paid two weeks' wages, would the jury have the jury known that put it in a different light? Now, the state tries to make a couple of, yes, Your Honor. If you say yes, why? Yes, Your Honor. Well, first of all, because of this Court's precedence. If we look at Robinson v. No, but we're talking about a factual situation here. It's not, this is not some other case. This is this case. And in this case, the question in my mind is what effect on any particular juror could it have had if the witness had told the truth? Your Honor, the reason factually to this case it makes a difference, this is not a case where we had ten witnesses that identified a defendant. This is a case where we had one witness that the State put forward. The State put this witness forward as an innocent person coming forward just to tell the truth. Now we know that she was paid $750. She was a bought witness by the State, and when she was asked whether she got any money, she denied it. Had the jury known that, that puts this case in a totally different light. That kind of impeachment, this Court's precedence has said are material and worthy of reversal. So in Robinson, the $70 payment, this Court found it was material because they said, you know, when the government is paying a witness, then that's the prosecution. That is a fundamentally different character of impeachment proof that the jury didn't know about. The jury very well could have believed that Mrs. Jackson was promised something from the very beginning when she first met those Federal agents, and then coupling that with the fact that she lied about it, that the jury could believe she lied about it, that there's something funny going on, that there's something not right here, that she was really doing this because of the huge sum of money that she received. Now the government tries to argue, we've talked about materiality, how she is the key witness. There is no other witness except for Mr. Fisher who identified two other people. You take Angela Jackson out of the State case, there is no case. So how important So are you, you know, there was the, well, there were a lot of instances where her testimony is sort of pivotal in the record. There was the testimony about the videotape. Yes, Your Honor. That that would not have been an important piece of evidence without her testimony to identify the person in there who was shown from the back. Your Honor, that's why she was critical. There's an old saying, a picture is worth a thousand words. I put the picture that the jury was shown in my reply brief. It's not, and I think the Court can look at that and see it's worthless without Angela Jackson who somehow magically can look at that grainy, black and white, obstructed view and say, oh, I can identify who that particular person is. So now the State also tries to argue, oh, well, Angela Jackson was impeached in other ways. There was other impeachment evidence. So therefore, this would be kind of cumulative impeachment evidence. Your Honor, the only other impeachment they did, the defense in Mr. Thomas' trial, did try to put forth the evidence that they had. I mean, they had evidence that she denied knowing Bobby Jackson. Other witnesses said she did, that she promised she was going to get Andrew Thomas back. She was mean to his child. But the kind of evidence that was not disclosed, the payment of $750 and basically the denying that, that is powerful evidence of a different sort, which is, again, what this Court said in Robinson. In Robinson, the government made the same argument. It was cumulative. And in Robinson, they argued the $70 payment wouldn't have made a difference because the witness at the preliminary hearing testified she didn't remember anything and she was totally contradicted at the trial testimony. This Court said the fact that the defense could not impeach with the bits of evidence they had does not mean that any more would be cumulative. It means that the more damning evidence was withheld, which is exactly what we have here. This Court said the same thing in Barton, reversed on materiality, to make sure that if there's evidence of a different quality, and that's what we have here. We have evidence of, we have evidence that we have a trial where you have one witness that's the key witness, where the witness is presented by the prosecution as this person coming forward because it's the right thing to do. And that is the State's case. And then we now know that it's stipulated, it's stipulated that the government paid $750 to this particular witness. I mean, as a lawyer, the fundamental fairness of that, this is a death penalty trial. Mr. Thomas is on trial for his very life. At a minimum, he's entitled to a fundamentally fair trial. And what do we know now in the record in hindsight about this trial that's supposed to be fundamentally fair? It's stipulated that there was a $750 payment. It's stipulated that it was exculpatory. And it's stipulated it wasn't given to the counsel. And the only question is materiality. Well, we know that this event happened, and Mr. Bond was there, and it was a white vehicle, and they switched into a red vehicle, right? And we're at some place with the money. We know Mr. Bond pled guilty in federal court. But the question in this State case, as you know, Mr. Bond didn't testify, is what evidence is there that Mr. Thomas committed this crime? He had a trial. There were two witnesses that identified Mr. Thomas. There was Angela Jackson and then the Richard Fisher who identified two other people. We know Angela Jackson was critical because in the State opinion, seven times the references is to her testimony. But there's a lot of this circumstantial evidence. You're not going to include that buying the fancy car? That testimony is dependent upon Angela Jackson because the car was titled in Angela Jackson's name. But didn't the salesman, didn't you say the salesman recognized Mr. Thomas? The salesman stated that he recognized it for the car that recognized Mr. Thomas as being present. But, Your Honor, if you take in terms of the buying of the car, right? It puts him into, he was with Angela Jackson when she bought a car at some point after this alleged thing happened. But we also know because of Did the salesman say that, he said that they were there together. Did the salesman say that he observed Jackson give Thomas money or Thomas give Jackson money? There was some testimony about money changing hands going from one person to the other and then to the salesperson. Your Honor, I don't want to make a misrepresentation to the court in terms of the particulars. I know that the car was titled in Angela Jackson's name. I know that she testified that she got the money from Thomas. But we also know, and there's a claim that I haven't argued, there's a lot of other evidence here about whether or not that Mr. Bond did this with Andrew Thomas or whether it was done with Mr. Bobby Jackson, whom Angela Jackson was also a friend with. There could be other reasons that Angela Jackson had money. What I do know is at this trial, at the death penalty trial, there were two witnesses that implicated Andrew Thomas directly. One of those is the critical witness where there was a $750 payment and that the jury very well, because she denied getting any money. If that information had been known under this Court's precedence in Barton and Robinson, that has to be material. Is there any reason to think here that the witness, Jackson, may have substituted Thomas for the other man, Jackson? Is there any reason to think that she would have any motive to substitute one for the other because of a relationship of some guy? Your Honor, there was evidence at the trial from witnesses that Angela Jackson had a relationship with Bobby Jackson. Bobby Jackson's picture was identified by witnesses that saw the scene as the driver of the vehicle. Bobby Jackson had been arrested three months later for a robbery of an armored car. So there is a lot of evidence. So, Your Honor, I mean, there was other evidence in the record. My point is, in a death penalty case, there were two witnesses. The one witness, the key witness, was paid and denied it. That is material in this Court's precedence, and he's entitled to it. Okay, and we've got that point. I just want to ask you, since you, in light of Judge Merritt's question. Yes, Your Honor. Were there similarities with respect to the bill and other physical characteristics between Jackson and Thomas? Your Honor, well, I mean, and again, this gets into the testament. When they came upon the scene, they found a getaway car. There was a fingerprint on the passenger's side of the door. The fingerprint belonged to Anthony Bond, okay? And then we know that a couple months later there was a robbery of a car of Bobby Jackson. He was a heavyset male. The witnesses said that the driver was a heavyset black male. We know that at the time that neither Anthony Bond or Andrew Thomas were less, you know, they were less than 155 pounds. We also know that when later Anthony Bond and them were arrested, that the fingerprint tied up to Anthony Bond. So Anthony Bond was caught. I mean, his fingerprint was on the car. He came, cut a deal with the government, testified in the Federal case, got a nice, got a 12-year sentence. Okay, I think you'll have your reserved time. Thank you, Your Honor. To kind of get away with that central question. Counsel? Good afternoon, Your Honors. May it please the Court. Michael Stahl for the Respondent. The State Court's rejection of the Petitioner's constitutional challenges to his conviction for the murder of James Day and his capital sentence were not an unreasonable application of any clearly established Federal law. And the District Court's determination that the Petitioner's constitutional challenges pursuant to Brady v. Maryland and Giglio v. United States are without merit. Is that a question of fact or law? It's a mixed question of fact and law, Your Honor. The Petitioner continues to make the claim that under Brady there was actual knowledge. And that's not true. There was no stipulation to actual knowledge. There was stipulation to, and the standard is actual or imputed knowledge. In this case, there was imputed knowledge. You admit that? I'm sorry, Your Honor? You admit imputed knowledge? We admit imputed knowledge, yes, Your Honor. What's the difference between imputed knowledge and knowledge? The State prosecutors did not actually know that Ms. Jackson had been paid $750 three years prior to her testimony. How do we know that? We have not. You say that there was imputed knowledge that the State prosecutor who was asking these questions should have known it or it's imputed that he knew it. But what is the evidence that he didn't know it? Well, it's the burden of the Petitioner to demonstrate that he did know it, Your Honor. And there's no— But imputed knowledge suggests knowledge. That's right, Your Honor. It suggests knowledge. But there's no evidence that there was actual knowledge in this case. There's no evidence that's been put forward by the Petitioner that there was actual knowledge that the prosecutor— Is that what this case turns on, the difference between actual knowledge and whatever imputed knowledge means? No, Your Honor. We just wanted to make that clear that the representation in the record is that there wasn't—there was the— The question—one question in my mind is whether the Augers case standard applies. And that case says that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. And that's the question, Your Honor. Is there any reasonable probability that the judgment of the jury could have been affected in this case? And the answer to that is no. How do we know that? Because if your two witnesses, as Mr. Hutton said, were Fisher and Jackson, if you strip away her status as an impartial, non-biased witness, how can you make that assertion? Are you okay? Yes. Let's take a quick recess. Somebody get some medical—let the Court stand on a short recess. This Court will take a brief recess. This Honorable Court is back in session. You may be seated. Mr. Connolly, please stop the timer immediately, so I don't have trouble talking. Thank you. Mr. Stahl, we have inquired and we understand that it is your desire, sir, to proceed at this time with your argument. That's right. We also just want to note for the record that we are happy to have you sit for the rest of your argument if you wish to. You have elected to stand. Yes, yes. I appreciate it. I've been under the weather. It just kind of caught me. That's fine. I just want to make this record because we've also offered to take the second case and let you get some fresh air because it's kind of warm. I don't think that will be necessary. Very good. I really appreciate it. Okay. You may continue then. Thank you. Your Honor, to answer Judge Merritt's question with regard to the standard in this case, if we're talking about Brady, the standard, and I think this is important to consider, is whether there's a reasonable probability that the result of the trial would have been different given Angela Jackson's, given this information with regard to Angela Jackson. There's a reasonable likelihood that the false testimony would have affected the judgment, would have affected the judgment of the jury. That's what the standard in Augers says. It's slightly different from the idea that it probably would have caused a different verdict. The standard here is that the false testimony could have affected the judgment of the jury. That's right, Your Honor. With regard to the Giglio v. United States claim, that's exactly right. In this case, that information would not have affected the judgment of the jury. Okay. And my question to you before was how do we know? Because witness credibility is an essential part of this. And the jury judges witness credibility by a number of measures. And certainly a falsehood is going to be one of those things that's going to impact that. And when you have a case that's got two essential witnesses, although the appellant says there was only one, well, you've only got two. How can you say that? And when you have those statements in the record where people say that she's a critical witness, how can you affirmatively say it wouldn't have affected that? Your Honor, there's a number of answers to that question, and that I think is a key question. Give me a couple of them. Well, first of all, you have to look in the context of the entire record. And the Petitioner did a good job of glossing over all of the evidence in this case. Second of all, you have to look at whether or not the witness was in fact impeached and whether that credibility was intact, which happened in this case. But if we go back to the entire record, which is what I think this Court wants to recognize, the other evidence in this case, this is not a situation where this case turned on one witness. To distinguish from all of the other cases that the Petitioner has put forth, between Robinson v. Mills and Barton, all those other cases, this is not an instance where we have one witness that is the sole witness to this case and is as critical as the Petitioner makes out to be. The entire record demonstrates that. First of all, we have the identification, the eyewitness identification of Richard Fisher. When asked in court how confident he was with regard to that identification, Richard Fisher answered, I'm very sure. Second of all, we have the videotape. The Petitioner did a good job of glossing over what that videotape means. But going back to Fisher, wasn't Fisher the one who had to go over up to the table to look more critically? Mr. Fisher was asked to approach the table by the defendant's co-counsel. But first he couldn't identify him. Is that correct? The first time he didn't identify the Petitioner, when asked to approach, Mr. Fisher testified that the car came within four feet of him. So defense counsel, co-defendant's counsel, asked Mr. Fisher to stand within an approximate distance to that, to the Petitioner, and asked to identify who he thought the shooter was. Mr. Fisher identified the Petitioner. Then he was asked, how confident are you in that identification? Mr. Fisher responded, I am very sure. He didn't identify somebody else first in the courtroom? In this trial, Your Honor, he was asked to identify who he thought the shooter was. And I do not remember him identifying someone different at the state trial. When he was presented with a line-up of photographs of who he thought the shooter was, he did not identify the Petitioner at first. But when he was asked to stand at an approximate distance to where he was standing when the white car sped past him, and he was asked to identify who the shooter was, he identified the Petitioner. He didn't make any other identification within the courtroom? At the state trial, I do not remember him making a misidentification at the state trial. I know that prior to the state trial, he identified in photographs another individual as being the shooter. But when he was asked by Petitioner's co-counsels, Petitioner's co-defendants' counsel to identify who he thought the shooter was in court, he identified the Petitioner. Was he absolutely certain of the identification before or after the Petitioner removed the glasses? And was that done at somebody's request, or did the Petitioner just voluntarily do that? He was asked to remove his glasses in order to ensure that he could get the best view of the two defendants. And he was asked to make sure that the identification he was making was a confident one. So when he did that, he identified the Petitioner. And when he was asked about the confidence level of that identification, he did not quibble. He said, I am very sure. That is powerful evidence. Angela Jackson was not at the crime scene. Angela Jackson doesn't know what happened at the crime scene. That type of evidence is critical evidence, and that is not in dispute. We also ---- But you're asking us to put a lot of weight on the certainty of that, of the witness's statement, he's absolutely certain. But there's legion evidence out there, though, where you've had people very confident of identifications, where there's been misidentification. And that's why we have to look at the entire record. We have other evidence that I think needs to be considered. If we exclude Angela Jackson's testimony completely, what are we left with? This was a case that had 30 witnesses and took 10 days to try. This was not an instance where you have one witness that was the sole critical piece of evidence in the case. But nobody else could put this defendant on the scene, except Mr. Fisher. Well, you also have the video of the actual crime being committed. I say it's not clear. The one that's in the brief looks terrible. Well, Exhibits 18 and 19 show the gunman standing in the open doorway. This Court made a finding in Petitioner's collateral Federal action, whereby after Ms. Jackson made the identification of the Petitioner as the shooter, this Court then stated this fact was corroborated by the Walgreens surveillance video, wherein the shooter matched Thomas rather than the taller bonds. That's the kind of evidence the jury was able to extrapolate from the video for themselves. The jury is able to accept or reject all or part of a witness's testimony. In this case, having the ability to see the video for themselves, having that video reduced to stills and looked at individually is not dependent on Angela Jackson's testimony. Now, why do you think the witness, the woman, falsified, didn't concede what was clearly true, that she got the money? Why do you think she told a lie about that, basically? Your Honor, we would dispute that she told a lie. It is not indisputably false, and the Petitioner also did a good job of this in his oral argument, glossing over the actual questions. The question to Angela Jackson was, when you were – the first question that was asked, when the FBI approached you in 1997 for your initial statement to them, did you ask for your reward money? Her answer was no. She was then asked, did you receive reward money? The answer was no. At Petitioner's Federal trial, she was asked by defense counsel, quote, isn't it true that you're interested in the possibility of receiving reward money for what you're doing in this case? She answered no. The next question was, in other words, you're not interested in any reward from the armored car company. She answered no. During her deposition, she answered that she understood any question with regard to reward to being something from the armored car company. She truthfully answered no. We can also look at Scott. I may not have been a reward or – it's not a reward, but I did get $750 from the government. Because it's not what she was asked, Your Honor. When she was then asked, did you receive one red cent for this, that was in regard to the State trial proceeding. And there was no nexus between that payment in 1998 – I don't think she should have straightened it out in any way. The standard, Your Honor, is indisputably false. Okay. Did the government have an obligation, though, to correct the record or at least to correct the misperception that was being provided by her answers to those imprecise questions? Well, that's the key, Your Honor. If you consider the questions imprecise, then how is the prosecution supposed to correct an imprecise question, an imprecise answer? But the prosecution has stipulated, though, that there was – that this information should have gone to defense counsel, so they should have had an opportunity to challenge this. They couldn't challenge it through their cross-examination because they didn't know. But that's not where the inquiry ends, Your Honor. The inquiry has to include the – what – even if the defense counsel had an opportunity to question the witness about that answer and the jury had heard that answer, what would the jury have heard? And what effect would that have had on the jury? The answer to that is the jury would have heard that three years prior to the state trial, Angela Jackson was paid $750 by federal U.S. marshals for her cooperation as a witness in the petitioner's federal case. They also would have heard that there is no nexus between her testimony at the state trial and that payment. They also would have heard that her testimony has remained consistent even before she got paid. She gave a – She was asked the question, did you get paid, basically. No, and that's important, Your Honor. Did you get a reward? Did you – I mean, how many ways can you ask the question? You can ask – well, that's the problem, Your Honor. Are we going to fault witnesses for answering a question that they – Well, a man's life may stand on this question. You're absolutely right, Your Honor, but the standard is no different. In a capital case as it is from any other case. And the standard is, did this – would the inclusion of this evidence have affected the outcome of the trial? Okay. So, Mr. Stahl, let's say that we accept this proposition that she wasn't asked the right question or there are answers to the questions she was asked or not technically wrong, looking just at the plain language. What do we do with this subsequent statement by the government, which almost tends to bolster the falsity, this not one red cent indicating that nothing changed hands? So what do we do with that? Don't we have to factor that in? Yes, absolutely, Your Honor, and that's why it's important to look at the question that was asked and the answer that was given. Doesn't that compound the falsity by omission? No, Your Honor. The question being asked was with regard to her testimony at the state trial. She was asked, are you receiving one red cent for this? If this court were to ask me, am I receiving payment for this, that would be understood – What was the $750 for? Let's just get to that. It was for her cooperation as a witness in Petitioner's federal trial. For her cooperation as a – and how does she cooperate other than testifying? She provided – when the FBI first approached her in her home, she provided a statement about all the facts that she knew with regard to the robbery. That initial questioning period took several hours. It was for that time and it was for the time, the expense, the loss of income from her testimony during the federal trial. But she repeated the same testimony in the state trial, right? That's true, Your Honor, and that's important. It's stupid that – surely she understands why they're asking her the question. Because she's repeated the same testimony all over again. They're asking her, did you get any money for this or did you get a reward or do you have one red cent or however you want to put it. I mean, she's not a stupid woman. She – I mean, if this is not perjury, I don't know what it is. Your Honor, it's not perjury. And you want us to believe that when the government goes out to question a witness in aid of an investigation, that the government is going to compensate them for their loss of income, loss of time and inconvenience for taking time to talk to officers about possible criminal activity. That's standard practice. Yes, you're right. It's the government – they're statutory allegations with regard to cooperating. That's a witness fee, though, that you're talking about, right? For the most part, Your Honor. But what you're saying here that you said they compensated her for loss of income. Any expense with regard to her testimony at the federal trial was being compensated for her cooperation. That's what the federal payment was for. Scott Sanders tells us in his declaration that the $750 payment that was subsequently given to Ms. Jackson was not anticipated, planned, or discussed with her at all. In every case that the Petitioner cites to support his allegation of a Brady violation, we're looking at a situation where there was either a sole witness to the crime or that the witness was being paid for their testimony. Okay. And just curious, what was her weekly income? She wasn't sure. She was asked at the deposition several years afterwards. So how do you compensate for loss of income when you don't know what the income is? How do you know you're not overcompensating, undercompensating? We don't know, Your Honor. There wasn't enough questioning with regard to the specific facts of the payment. Scott Sanders was asked for his testimony about what the payment was for. And the extent of that was, do you know whether Ms. Jackson was ever paid anything in the form of reward or anything else in connection with her testimony? Yes, she was after the conclusion of the case, after the sentencing. I believe she was given the sum of $750. We have that statement from Scott Sanders, and we have the declaration from Scott Sanders saying that the payment was in no way connected to her testimony for any illusion of fabrication or alteration or modification or anything like that, which is what the Giglio standard is supposed to protect against. Do you know how many hours she spent aiding the investigation? Was there some calculation of that? We don't have a precise calculation. So we really don't have all of the metrics to be able to tailor this to what you say is compensation for her time in answering questions and loss of income, because we don't know what her income was. We don't know how much time she spent with them. So we just know that $750 is a fair representation or fair compensation for her loss of income and for the other things incident to that. That's the evidence that we have, Your Honor, and I think that's important to recognize because it is the petitioner's burden to demonstrate that a constitutional violation occurred. And you're exactly right. There's been no proof or evidence presented that would demonstrate that this payment was in any way caused a fabrication, modification, alteration of the petitioner's testimony. And that is what the Giglio standard is trying to protect against. It's trying to protect against the idea that a witness is going to stand up there and be used as a tool for the government to offer imprecise or improper testimony. And because we don't know what the payment was for, the petitioner can't show that. You just used imprecise. So are we going to look at imprecision and falsity? Well, the standard is indisputable falsity, Your Honor, and the petitioner has to show that. And we don't have that here. We simply don't have that here. But I'd like to go back a little bit to the other evidence in the record that we can look at and ask ourselves how important was Angela Jackson's testimony in this. We have Richard Fisher's eyewitness identification. We have the videotape that the jury was able to look at. How clear was the videotape? Was it clear enough to see the face of the offender? There were two exhibits, exhibit 18 and 19, which showed the gunman standing completely in open doorway. It is for each juror to decide for themselves what that videotape showed and what it didn't show. We at least know that the videotape showed that the surveillance video matched Thomas rather than the taller bonds because that's what this court found. So we at least know the videotape could have done that. But we also have, we also have the co-defendant's confession. We have a confession that was corroborated by the co-defendant's girlfriend, Tanya Monk. You can't use that against Thomas, can you? It didn't implicate Thomas directly, Your Honor, but it talked about the facts and the circumstances of the case, of the crime. We also have. It would violate Bruton if you use it against the defendant here, wouldn't it?  It was introduced for the purpose of the co-defendant saying this is what happened at the crime because Angela Jackson wasn't at the crime scene. So the evidence we have actually occurred. Now you want to use it to inculpate the defendant. Not necessarily, Your Honor. A lot of the. I beg your pardon. I thought that was what you just said. No, I'm just trying to offer this Court the evidence that was introduced at trial. The co-defendant's confession, which did not implicate the petitioner, was part of the evidence that was introduced at trial. We also have eyewitness identification that Angela Jackson's car was parked around the corner, that the two gunmen, the getaway driver and the shooter, entered into a white car, drove around the corner and got into Angela Jackson's red Suzuki and drove away from the scene. That was independent eyewitness testimony. We also have testimony corroborating Angela Jackson's testimony from the person who sold Angela Jackson and the petitioner the car, from Angela Jackson opening up a bank account with over $2,000 the day after the crime. We have testimony from the pawn shop owner saying that he sold Angela Jackson and the petitioner a shotgun the day after the crime and other valuables. But so Angela Jackson was a key, key witness, right? No, Your Honor. If you exclude Angela Jackson's testimony, we still have all of those other eyewitness testifying to those facts. We have eyewitness testimony saying Angela Jackson and the petitioner entered into my store and bought a $4,000 car the day after the crime. Angela Jackson and the petitioner entered my store and bought a shotgun and other items the day after the crime. But without Angela Jackson's testimony, how is that – how are you going to tie this guy to that? Well, it demonstrates that the petitioner came into possession of significant amounts of money the day after the crime. So it demonstrates – But he didn't come in and buy anything, right? They testified that he drove the car off the lot, Your Honor, that the salesperson understood that they were selling the car to Andrew Thomas. They put the car in Angela Jackson's name because Andrew Thomas did not have a license. But Thomas took the keys and drove the car off the lot. Angela Jackson drove her car off the lot. How do we know without Angela Jackson's testimony who drove the car off? Because the pictures are pretty hazy, and we – how do we know without Angela Jackson's testimony? You can look through the testimony of the other eyewitnesses and tell for yourself what they testified to. They testified to these two people entering into their establishments and using stolen funds to open a bank account, to buy a car, to buy a shotgun and other valuables. Without Angela Jackson's testimony, these people could still sit there and testify to what they saw and what they did the day after the – They opened the bank account. There wasn't a joint bank account between Thomas and Jackson. No, but what the bank fraud officer testified to is that Angela Jackson entered into her establishment and opened a bank account with over $2,400 in funds. So they needed her testimony in order to prove that, right? No, the bank fraud officer could testify to that without Angela Jackson being there, Your Honor. You're saying that Angela Jackson's testimony was really not particularly important. It's not critical to the outcome of this case. When you have 30 witnesses in a 10-day trial, and you have the eyewitness who was not at the crime scene, you can't say that that witness was the sole or key witness to the case. When you have an eyewitness to the crime, when you have a videotape of the crime, when you have numerous other witnesses talking about what happened with the proceeds the day after the crime, when you have independent witnesses saying that they saw Angela Jackson's car parked at the scene and that the getaway driver and the shooter got into that car and drove away, when you have testimony, Exhibit 24 was the victim's testimony from the federal trial saying that he knew Andrew Thomas and that he could identify Andrew Thomas in court. When you have all of these other facts, it is not reasonable to say that Angela Jackson's testimony was the only or the key testimony in this case. You also have to look at whether or not Angela Jackson's credibility was attacked in this case. It was significantly attacked in this case, regardless of the payment. Angela Jackson was accused of being cruel to the Petitioner's son, and that's the reason she was testified. Angela Jackson was accused of trying to get back at the Petitioner because she was angry that the Petitioner went out late at night during their marriage or had other girlfriends during her marriage. Do you think those things are comparable to a showing of bias because one has received a significant payment? Absolutely, Your Honor, because there is no showing of bias. First of all, the Petitioner cannot show that there is any nexus between Angela Jackson's testimony at the State trial and the payment. And there is no showing of – the Petitioner admits that there is really no bias here. He says Angela Jackson needed to testify at the State trial consistent with her other testimony because of the fear of perjury. He is not accusing the government of using Angela Jackson to introduce false testimony or altered testimony or modified testimony because of a payment. He is saying that she testified that way because of – because she was scared she was going to be perjured. But there is no – there is no bias with regard to whether there was financial gain expected because of this payment and the testimony that Angela Jackson gave. In fact, Angela Jackson's testimony has never been credibly attacked. There is no – there is no evidence that – You should have disclosed the money that she got. I mean, I can ask these kind of questions, you know, with one red cent and all that, and not understand they're asking you about what payments you got. Because of the – because of the question that was asked, Your Honor, the question was are you receiving one red cent for this, for her testimony at the State trial. And she was not. There is no connection between that payment and her State trial testimony. She was asked whether or not she was receiving a reward or whether she asked the FBI for a reward. She didn't. And she never received a reward. The same testimony she gave at the State, she gave at the Federal, right? Substantially the same. Yes, Your Honor. And it's also substantially the same from the statement that she gave to FBI agents a year before she got paid anything. So she was – she never got paid anything before she told the FBI and Federal U.S. Marshals all about her version of the events. So there is no way that you can testify – I just want to see why she didn't admit it and say or explain it in some way. I mean, this doesn't make sense to me. Because she wasn't asked that question, Your Honor. It would have been very simple to say have you ever been paid before or after the Federal trial against the Petitioner. It would have been a simple question. That's not what she was asked. She was asked about reward money. She was asked whether she was receiving money for this. That's why she did – she answered the way she did. Mr. Stoll, in assessing the truthfulness or falsity of Ms. Jackson's statement regarding the payment, should we look at anything other than the plain language, the plain wording of her statement? Should we go beyond those plain – that plain statement in assessing whether that was a truthful statement or a false statement? I think it's important to look at the actual question and the actual statement because the standard is indisputable falsity. You can't ask yourself whether or not the – if you interpreted the question differently, whether someone else would have interpreted the question differently. That's why the standard is indisputable falsity. So you have to look at the actual question that was asked and the actual answer that was given. All of the cases that the Petitioner cites to with regard to this have to do with statutory construction or cases that talk about whether or not the issue of false testimony is – with regard to the culpability of the prosecutor. But that's not the standard. That's not what we want to know when we're asking about Giglio v. Gina. We're not talking about the question and answer. We're not talking about the culpability of the prosecutor. We're talking about the fundamental fairness of the trial. The fundamental fairness of this trial did not turn on whether or not Ms. Jackson received a payment three years prior by Federal U.S. Marshals for her cooperation in the Petitioner's Federal case in the Petitioner's State trial for felony murder. There's no connection between those two. It doesn't – there's no – there's no probability that the outcome may have been different if the jury had heard that three years prior she received this payment for her testimony. Why did she not admit it? Why was she – it appears she's covering that up. Now, why would that be? She wasn't covering it up, Your Honor. She was answering the question that she was asked. And the standard is indisputable falsity with regard to the question that was asked. Maybe she wasn't very well educated. Your Honor, she would – Do you know the answer to that? I don't want to speak to her education level, Your Honor. She must have not been too smart to marry this defendant here. Love those crazy things, Your Honor. But I think what we need to consider in this case with regard to the question about Brady and Giglio is was the fundamental fairness of this trial compromised because of this evidence, the exclusion of this evidence? Was the question and the answer that was given indisputably false? And is there any reasonable probability that the outcome of this case would have been different had the jury heard that there's no nexus between Angela Jackson's state trial testimony and her payment three years prior by Federal U.S. Marshals? And the answer to all those questions is no. Thank you, Your Honor. Thank you, Mr. Stone. Mr. Hutton, you have your five minutes rebuttal time. Thank you, Your Honor. Your Honor, first of all, with respect to Mr. Fisher, I'd ask, Your Honor, I don't have time to look at it now, but look at, I've cited on page 43 of my brief, the trial testimony of Richard Fisher, page ID 2038 to 2044, because it's important what Mr. Fisher testified when he's being directed. He's asked, do you see the person that you saw in the getaway car? And he says, it's Anthony Bond. He points out Anthony Bond, not my client. This caused a big consternation in the court. They had a sidebar, and it's also in my brief. It's at page 2053, where the trial judge said, well, Mr. Fisher, quote, while he was doing the best he could, as he said from the witness stand a moment ago, wasn't real sure of any identification. Which trial was this in? This is in our trial, the State trial where Mr. Thomas is being tried for his life in a death penalty case. He's already identified him in the Federal trial? No, he didn't testify. Mr. Fisher did not testify in the Federal case. He testified in the State case. He had already previously identified somebody else named Terrence Lawrence as who he saw. Then he gets up, and the DA puts him on the stand. Do you see the person that you saw from four feet away? There he is, Your Honor. It was Mr. Anthony Bond. Then what happens is the trial judge says, well, he doesn't seem to be pretty sure. This was a long time ago. It's then when Mr. Bond's lawyer, on cross-examination, trying to correct his client, makes him get off the stand, go and sit in front of my client, take off his glasses. Now do you see who did it? That he changed his testimony. So to say that that is a real sure identification after the trial judge himself had already called into question his ability to make an identification and after he'd under oath already identified somebody else and previously out of court identified a third person makes absolutely no sense to say he was a credible witness. Now, Your Honor. Do you admit or deny that there was sufficient evidence here or do you just exclude Angela's testimony entirely? There was absolutely insufficient evidence. Angela Jackson was the key case. That's why in the state trial court opinion, Angela Jackson is mentioned seven times. But she wasn't an eyewitness and wasn't on the spot, right? She wasn't, but there was no eyewitness on the spot that identified Mr. Thomas other than Mr. Fisher who'd previously identified two other people. I mean, that's the whole thing about this case. There's a red herring here. There were 30 witnesses at trial. Yeah, there were lots of witnesses. They talked about the crime scene and all, but none of it penned this on Andrew Thomas. That's the issue. It's Angela Jackson was the one that said, oh, it was my car that was used by Thomas. It's Angela Jackson that opened the bank account. It's Angela Jackson that said he admitted to me that he did this particular crime. Now, the other interesting thing about this is it's the same Safe Streets Task Force, which keeps them coming, this joint task force, did both particular cases. Now, my colleague said that, oh, this was money for her expenses, that that's why they paid her the money. If you look, the government that after the trial gave her money for her services that she rendered to the government, there weren't receipts collected. In a federal trial with a fact witness, you don't get to get your time compensated other than the $18.21, $40 a day. And for them to give a payment of two weeks' payment after this trial and not to disclose that is absolutely, and to say, oh, well, that was for her time or something. They're not allowed to pay for time, Your Honor. The government has said they can pay $40 a day, and that comes from the marshal's office, not from the FBI through the Safe Streets Task Force. This case smells horrible. This is a case where a man was put on trial for his very life. And we know that. You're saying that's an illegal payment, or you're just saying that they should have known about it? Your Honor, I think that there is no statutory authority for the government to pay $750 to a fact witness. There is statutory authority for the government through the marshal's service to pay $40 a day and mileage. That is not what this particular payment was. This payment was denied under oath. And Ms. Jackson, she could expect she's going to get another gift. Does that make sense, Your Honor, that after the trial, for no reason, they just come with a Christmas gift and sort of give her $750? This was a trial for a man's life. There was one witness. That witness was paid $750. That witness said you didn't get one red cent. That's correct. That's what was said to imply she didn't get any money. Why did they ask those questions? Why did D.A. Warrick ask that? It was to make her look like she was totally unbiased. That was not the case in this particular case. Did she get her statutory fees on top of this or you don't know? Your Honor, we don't know because those records were not kept. It was too far back. How many days did she sit around court waiting for the trial to finish? Your Honor, I believe from the record that her testimony was on one particular day and then there was a rebuttal, so at the most it would be two days, but I can't say. Your Honor, we don't know. We asked for an evidentiary hearing, and that's the final point I'd like to make. We were going to try to get into what people knew, but when the government conceded in their brief for the false testimony claim knowledge, then that rendered that moot. We didn't get our hearing because they've stipulated to that. If she was subpoenaed and sat outside the courtroom for 10 days or so, she'd be entitled to $400 plus expenses. Your Honor, she very well may have gotten that because that would come through the marshal service under 1821. This money came through Safe Streets Task Force and the FBI. She could have gotten that, too, and she probably did. We don't know. We don't know. But what we do know is she was paid, and, Your Honor, justice demands that my client get a new trial. Thank you, Mr. Hutton. The matter is submitted. We appreciate your appearances. Thank you very much.